IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| DAVID LEE WEBSTER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-0002 |
| | ) | Judge Trauger |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM

Pending before the court is a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence filed by the *pro se* Petitioner David Lee Webster. (Docket No. 1.) Pursuant to Rule 5 of the Federal Rules governing Section 2255 cases, this court ordered that the Government file a response to the motion, which the Government has done. (Docket Nos. 4 and 18.) For the reasons discussed herein, the petitioner's motion will be denied, and this case will be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

The present proceeding arises out of the petitioner's arrest in Columbia, Tennessee on August 24, 2007.[1] Late that afternoon, Webster was driving to his grandmother's house on the

---

[1] Unless otherwise noted, the facts are drawn from the parties' briefs on this motion and from the preliminary hearing testimony provided by Officer Michael Ward in the Murray County, Tennessee General Sessions court proceedings related to Webster's arrest. (Docket No. 2 Ex. D, Docket No. 2 and Docket No. 18.)

1

west side of Columbia in his brother's silver Dodge four-door sedan. The sedan had darkly tinted windows. As he approached his grandmother's house, Webster passed a Columbia Police Department vehicle traveling in the opposite direction. The operator of the police vehicle, Columbia Police Officer Michael Ward, noticed the sedan's tinted windows and came to the conclusion that the windows were too dark to be in compliance with Tennessee law. Ward turned around, activated his lights, and pulled Webster over.

Ward got out of his vehicle and walked toward the Dodge sedan. By the time that Ward arrived at the front driver's side window of the sedan, the window was rolled down and Ward could see Webster and the interior of the vehicle. At this time, Ward asked Webster for his license, registration and proof of insurance. Ward claims that, from the time that he was pulled over through the time that Ward asked for these documents, Webster was "very nervous" and was constantly "digging" around in the car. (Docket No. 2 Ex. D. at 7-8.)

Webster, after digging around in his pockets, produced his license and insurance card but could only produce an out-of-date registration card. (*Id.* at 8.) Ward, along with advising Webster that he had been pulled over for a tinted windows violation, permitted Webster to call his brother to obtain the location of the up-to-date registration card. During the course of the stop, members of Webster's family gathered on the sidewalk and street near where Webster was pulled over. In light of Webster's continued fidgeting and the gathering of supporters, Ward radioed for back up, which arrived very quickly. (*Id.* at 9.)

After Webster got off of the phone with his brother, Ward directed Webster to get out of the car. Webster refused, insisting, in a profane manner, that Ward had no right to detain him for

2

a tinted windows violation. The situation quickly escalated, with Ward repeating his command for Webster to exit the vehicle, Webster continuing to refuse to do so, Ward attempting to grab Webster through the car window, and, finally, with Webster rolling up the car window and locking the doors. At this point, Ward and his back up, Officer Anthony, stepped back from Webster's car and draw their guns on the vehicle.

After about a minute, Webster stepped out of the vehicle. As he did so, he closed the driver's side door behind him, locked the door, and threw the car keys in the direction of his father, who was one of the individuals who had gathered to watch. As he threw the keys, Webster advised his father that the officers had no right to search the car and he should not let them do so. The keys, however, landed in the middle of the road, and Officer Johnson, who had also responded to the back-up call, grabbed them before Webster's father could. Ward claims that, in the brief moment that the front door was open, he could smell marijuana in the car. (Docket No. 2 Ex. D. at 14.)

After the key-throwing incident, Ward ordered Webster to the ground at gun point. When Webster defied that order, Ward holstered his gun and drew his taser, at which time Webster complied with Ward's demand that he get on the ground. With Webster on the ground, Ward conducted a "pat down" search of Webster. At the state preliminary hearing, Ward testified that, during that search, he observed the tip of a plastic baggie coming out of Webster's front pants pocket and felt a "large lump" in that pants pocket area as well. (Docket No. 1 Ex. D. at 12.) Ward removed the baggie from Webster's pants, and the contents of the baggie field-tested positive for cocaine. At that time, Webster was placed under arrest and read his *Miranda*

3

rights. Subsequent searches of Webster by Ward and another officer on the scene recovered a small amount of marijuana and $7,438 in cash. (Docket No. 1 Ex. D at 13.) Webster was handcuffed and detained away from his vehicle.

Once Webster was secured, the officers unlocked Webster's car and began searching inside. During the search of the car, Ward opened the center console between the two front seats and found, among other things, "a very large bag of crack cocaine, a bag of marijuana, and a handgun," which was loaded. (*Id.* at 14-16.) Later forensic analysis revealed that the officers seized 16 grams of marijuana, 9.5 grams of cocaine, and 100.6 grams of cocaine base. A later test firing of the handgun (a Glock pistol) revealed that it functioned as designed.

In addition to being subject to state criminal proceedings, on March 5, 2008, Webster was indicted in this court on a single count of possessing a firearm after previously having been convicted of a crime punishable by more than one year in prison in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(c); Webster subsequently pleaded not guilty. (Case No. 1:08-0005, Docket No. 1, Docket No. 8.)

On May 28, 2008, a superseding indictment was issued, adding the charge that Webster "knowingly and intentionally possess[ed] with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of cocaine base . . . ." in violation of 21 U.S.C. § 841(a)(1). (Case No. 1:08-0005, Docket No. 14.) Webster pleaded not guilty to this indictment as well, and, around the same time (June 2008), the court granted the motion of Webster's retained counsel, Barry Tidwell, to withdraw from the case, in light of the breakdown of the relationship between Tidwell and Webster. (Case No. 1:08-0005, Docket Nos. 17-19.)

4

Tidwell's withdrawal resulted in the appointment of Caryll Alpert, an Assistant Federal Public Defender, as Webster's new lawyer.

On September 5, 2008, Webster, now represented by Alpert, filed a Motion to Suppress all evidence obtained during the traffic stop. (Case No. 1:08-0005, Docket No. 28.) With scant explanation, the three-page motion argued that the Columbia Police "lacked legal justification to stop" Webster's car and, "even if the initial stop was justified, the subsequent continued detention and searches of Mr. Webster and the car were unlawful." (*Id.* at 2-3.) In its response, the Government offered argument and caselaw justifying the stop, the pat down, and the subsequent search of the car. (Case No. 1:08-0005, Docket No. 29.) On October 3, 2008, the suppression hearing, which was originally set for October 7, 2008, was continued to December 15, 2008, as Alpert stated that she needed additional time to investigate the circumstances of Webster's arrest. (Case No. 1:08-0005, Docket No. 31, 33.)

On December 10, 2008, the defendant, again through Alpert, filed a Motion to Withdraw Suppression Motion and Cancel Evidentiary Hearing, which was granted. (Case No. 1:08-0005, Docket Nos. 35-36.) The Motion to Withdraw stated that "additional investigation and research" had revealed that withdrawal of the suppression motion was appropriate. (Case No. 1:08-0005, Docket No. 35.) On February 11, 2009, Webster pleaded guilty to both counts of the superseding indictment, and, on May 27, 2009, consistent with a binding plea agreement entered into by Webster and the Government, the court sentenced Webster to an agreed-upon sentence of 120 months on count one and 151 months on count two, with the sentences to run concurrently. (Case No. 1:08-0005, Docket Nos. 38, 48.)

On January 4, 2010, Webster, now proceeding *pro se*, initiated this current round of litigation by filing the pending motion to "vacate, set aside, or correct sentence" under 28 U.S.C. § 2255. (Docket No. 1.) Webster claims that he received ineffective assistance of counsel from Alpert. (*See id.*) In support of his argument, Webster has filed a brief and an affidavit, in which he claims that Alpert did not investigate the facts or law of the case, and, instead, simply told Webster that he "was facing a life sentence if [he] didn't take the plea that the AUSA was offering and pissing the AUSA and the Judge off wouldn't be a good thing." (Docket No 3.) Webster also broadly alleges that he was pressured and rushed by Alpert into taking the plea. (Docket No. 2 at 6.)

In response, the Government submitted Alpert's affidavit under seal. (Docket No. 20.) Alpert states that she conducted a thorough investigation into the circumstances of the traffic stop and into the individuals involved. (*Id.*) She maintains that she discussed the results of the investigation with Webster and, in that conversation, she described the difficulties that Webster would have prevailing on the suppression motion. (*Id.*) Alpert contends that Webster, after this discussion, decided it was not worth proceeding with the suppression motion, and, therefore, the motion was withdrawn and the hearing cancelled. (*Id.*) Alpert also generally denies pressuring Webster inappropriately or using the sharp language discussed above; although, she does maintain that she advised Webster of the risks of not entering into the plea agreement (a longer prison sentence if convicted). (*Id.*)

## ANALYSIS

In relevant part, Section 28 U.S.C. § 2255(a) states that "[a] prisoner . . . claiming the

6

right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." Here, Webster claims that the sentence was imposed in violation of his constitutional rights because his counsel was ineffective. In his *pro se* Motion, Webster lists four "grounds" for relief, but they are all premised on allegedly ineffective assistance of counsel.[2] (Docket No. 1.)

Under Section 2255(b), Webster is entitled to a "prompt hearing" on his motion unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). It is within the district court's discretion to determine whether an evidentiary hearing is required. *Green v. U.S.*, 65 F.3d 546, 548 (6th Cir. 1995). Generally, if there is a relevant factual dispute, then a hearing is required, but if, based upon the undisputed facts, the law dictates that the prisoner is not entitled to relief, it is not necessary to conduct further proceedings. *Ross v. U.S.*, 339 F.3d 483, 490 (6th Cir. 2003).

Therefore, the issue for the court is whether Webster has sufficiently shown, under the relevant standards, that his counsel was constitutionally ineffective such that his case should be permitted to move forward to the evidentiary hearing stage. The court concludes that he has not.

I.   **Ineffective Assistance of Counsel**

---

[2] Ground One is listed as "Ineffective Assistance of Counsel," Ground Two is "Ineffective Assistance Sixth Amendment Violations," Ground Three is "Counsel was Ineffective for not Challenging the Violation of Webster's Fourth Amendment," and Ground Four is "Counsel was Ineffective for not Using Adequate Caselaw Research Before Coercing Webster to Take the Plea." (*See id.*)

To prevail on an ineffective assistance of counsel claim, the petitioner must show that his "counsel's deficient performance prejudiced him." *Porter v. McCollum*, 130 S.Ct. 447, 452 (Nov. 30, 2009). In order to "establish deficiency, [the petitioner] must show that his 'counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)). The reasonableness "standard is necessarily a general one. 'No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'" *Bobby v. Van Hook*, 130 S.Ct. 13, 16 (Nov. 9, 2009)(quoting *Strickland*, 466 U.S. at 688-89). While the professional rules of conduct and restatements in place at the time can be a useful guide in assessing the reasonableness of conduct, they also cannot be viewed as definitive. *See id.* at 16-17. Therefore, "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1420 (Mar. 24, 2009)(quoting *Strickland*, 466 U.S. at 688).

That said, under *Strickland*, "[j]udicial scrutiny of counsel's performance must be highly deferential," and a court must resist the temptations of hindsight and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689. Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

Likewise, the prejudice standard is factually and contextually specific. To establish prejudice, the plaintiff "must show that there is a reasonable probability that, but for counsel's

8

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Capturing the deferential nature of the test and the relative difficulty of establishing an ineffective assistance of counsel claim, the Sixth Circuit has stated that "the determinative issue is not whether petitioner's counsel was ineffective but whether he was so throughly ineffective that defeat was snatched from the jaws of victory." *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (internal quotation omitted). The petitioner's burden in the case of a guilty plea is similar – that is, in addition to showing deficient performance, he must also demonstrate that he would have reached a different decision on how to plead but for counsel's errors. *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).

### A. Deficient Performance

Webster claims that Alpert's performance was deficient because she failed to "truly investigate" the circumstances of the stop. (Docket No. 2 at 9-16.) Webster points to Ward's testimony during the state court preliminary hearing, which, he claims, was littered with inconsistencies, including that Ward, on the one hand, claimed that Webster's windows were so dark that one could not see into the car, but, on the other hand, Ward claimed that he could see Webster fidgeting and digging in the car, even before Ward arrived at the driver's side window. (*Id.* at 11-12.) Moreover, Webster notes that his windows could have been legal if he had a "compliance" sticker on the front driver's side window (which Webster did not have), but Ward would not have been able to tell if Webster had a compliance sticker because that window was rolled down. (*Id.* at 9.) Webster also claims that Ward concocted an implausible excuse (safety) to justify ordering Webster out of the car, which, as discussed above, led to the pat-down search

9

and the search of the car.  (*Id.* at 16.)  Webster maintains that thorough and "true" investigation, followed by rigorous cross-examination at the suppression hearing, would have shown that Ward was not honest about the circumstances of the search.  (*Id.* at 13, 16.)

Relatedly, Webster also claims that the search of his car was constitutionally impermissible, that Alpert should not have withdrawn the suppression motion in light of that fact, and that her decisions were influenced by a lack of legal research and factual investigation.  (*Id.* at 18.)  In support, Webster cites the *Arizona v. Gant*, 129 S. Ct. 1710 (April 21, 2009) case.

In that case, the Court concluded that "police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest.  When these justifications are absent, a search of the arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies."  *Id.* at 1723-24.  Webster argues that, in light of this case, and the lack of any other "exigency" that would have justified the search of the car, the search was not proper under the Fourth Amendment, and it was ineffective assistance to abandon the suppression motion. (Docket No. 2 at 18-19.)  Webster claims that his counsel failed to thoroughly research the relevant case law, such as *Gant*, because, if she had, she "wouldn't have advised [Webster] to take any type of a plea."  (*Id.* at 22.)

Finally, Webster maintains that he was "coerced" to take a plea – that is, Alpert told him that, if he did not take a plea, the Government could seek sentencing enhancements and that Webster needed to make a decision very quickly.  (*Id.*)  Webster maintains that Alpert, fearing

10

that a suppression motion would "only upset and piss the government and court off" and would not be successful on that basis, unreasonably pressured Webster into taking a plea deal, at one point telling him that he had only 24 hours to take the "plea for the 151 months or he was going to take the chance of getting a life sentence." (*Id.* at 6, 22.)

As discussed above, Alpert's affidavit contradicts Webster's recollection of the events surrounding the representation. Indeed, Alpert maintains that she recognized the "suppression of evidence" as a "potential issue" from the outset of her representation of Webster. (Docket No. 20.) Along with her investigator, Alpert claims that she conducted a full investigation, which included (1) reviewing the state court records and preliminary hearing transcript, (2) viewing and photographing the scene, the car, and the evidence obtained, (3) reviewing Columbia Police Department records from the incident, (4) identifying and subpoenaing potential witnesses for the suppression hearing, and (5) investigating Officer Ward's background, including investigating his proclivity to issue tinted window citations. (*Id.* at 1-2.)

In light of this review, Alpert claims, she came to the conclusion that the evidence probably would not end up being suppressed. (*Id.* at 3.) That is, although some evidence might indicate that Ward "was not the most exemplary law enforcement officer," there was a legitimate basis for the tinted windows stop, and "the traffic stop escalated due to actions Mr. Webster took as confirmed by witnesses that we interviewed." (*Id.*) Alpert states that she conveyed these findings to Webster, who made the decision that the suppression motion should not be pursued. (*Id.*)

Moreover, Alpert claims that she did not coerce Webster into taking a plea, and she

11

rejects Webster's contention that she used sharp language such as "piss off" or that she asserted that Webster was certainly facing a life sentence if he did not plead guilty. (*Id.* at 2.) According to Alpert, substantive discussions with the Government regarding a potential plea agreement did not even take place until November 12, 2008, that is, more than two months after the suppression motion was filed. (*Id.*) In those discussions, the attorney for the Government, Darryl Stewart, stated that the Government would seek a sentencing enhancement under 21 U.S.C. § 851 if Webster insisted on proceeding to trial, and this enhancement would increase the mandatory minimum time from 10 years to 20 years. (*Id.*)

Alpert maintains that these discussions with Stewart naturally led to discussions with her client about the risks and benefits of entering into a plea agreement. That is, based upon his prior convictions and the current charges, Webster faced a maximum sentence of life in prison, and, if Webster qualified as an "armed career criminal," which, Alpert contends, was a debatable issue of law, he would be facing a guideline sentence of 262-327 months of imprisonment. (*Id.* at 2-3.) Alpert states that she also advised Webster of other potential enhancements that the Government could seek, including a five-year enhancement under 18 U.S.C. § 924(c) (that would run consecutively to the rest of his time) "because the gun and drugs were located together in the car." (*Id.* at 3.)

Alpert states that, once the 151-month offer was on the table (apparently after the suppression motion was withdrawn), she again advised her client of his options. That is, he could take the deal, plead guilty without a deal, or go to trial. (*Id.*) Again, the risks of not taking the deal were potential charge enhancements and court rulings that could result in significant

12

time, well above 151 months. (*Id.*)

Finally, Alpert states that she learned of *Gant* shortly after that opinion was announced, that is, between the guilty plea and prior to sentencing. (*Id.* at 4.) Alpert contends that, while she does not specifically recall discussing *Gant* with Webster, she recalls reviewing *Gant* and making the determination that *Gant* would not influence the overall determination that the search of the car was permissible.

As can be seen from the discussion above, there is very little, other than Webster's conclusory statements, to indicate that he received ineffective assistance of counsel. Alpert's affidavit, which references the specific steps she took to conduct a thorough investigation of the facts surrounding the stop and which discusses the specific conversations she had with the Government and her client, provides every indication that Alpert provided effective assistance under the *Strickland* standard. Therefore, prior to the consideration of prejudice, the record is very close to one that "conclusively show[s] that the prisoner is entitled to no relief."

### B. Prejudice

The undisputed facts demonstrate that the evidence used to charge Webster, in all likelihood, would not have been suppressed and, therefore, Webster is unable to demonstrate prejudice as to the abandonment of the suppression motion. First, it is clear that Ward had probable cause to stop Webster. Webster had darkly tinted windows, and, Tennessee law, specifically T.C.A. § 55-9-107, makes it unlawful to operate a vehicle with windows that have significantly reduced "light transmittance."

It is true that a professional car window installer may affix a small label to the lower right

13

hand corner of the drivers' side window that indicates that the window is compliant with the tint law, and one is not in violation of the tint law if they have a slightly darker-than-normal window but also have a compliance sticker and compliant window. T.C.A. § 55-9-107(a)(3). However, even if Webster had a compliance sticker, which he did not, the law is such that Ward had probable cause to stop Webster for a tint law violation just by noticing the darkly tinted windows, as it would not be clear to an officer driving past whether or not the individual had a valid compliance sticker or a compliant window. *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003)(internal citation and quotation omitted)(probable cause exists when the "facts and circumstances within the officer's knowledge [are] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.")

Moreover, it is within the officer's rights to direct an individual to exit the vehicle during a lawful investigatory stop. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *U.S. v. Bell*, 555 F.3d 535, 542 (6th Cir. 2009). Therefore, Officer Ward did not violate Webster's constitutional rights when he ordered him out of the car.

Once the individual is outside of the vehicle, if the officer has "reasonable suspicion" that the individual is armed and dangerous, it is also within the officer's rights to conduct a pat-down of the individual detained. *U.S. v. Campbell* 549 F.3d 364, 372 (6th Cir. 2008). Reasonable suspicion exists when a reasonable person, viewing the circumstances as they were at the time, would be warranted in being concerned for his safety and the safety of others around him. *Id.* Here, given Webster's profane refusal to exit the car, his furtive movements, and his locking of

14

himself into the car for about a minute, a reasonable person arresting Webster would be justified in being concerned that Webster was armed and dangerous. Therefore, the pat-down was justified.

While this pat-down is designed to secure the officers' safety and discover any weapons or other tools that could harm the arresting officer, if, during the pat-down, an officer plainly views an item of contraband or discovers an item of contraband through "plain feel," the officer may investigate and seize that item (so long as it turns out actually to be contraband). *Campbell* 549 F.3d at 373; *U.S. v. Garcia*, 496 F.3d 495, 505 (6th Cir. 2007). Here, Ward had testified that the tip of a baggie, which was of the type consistently used to transport small quantities of drugs, was plainly visible during the pat-down, as it was sticking out of Webster's front pocket. Also, Ward had testified that, when patting down this area from which the baggie was sticking out, he felt a "large lump," also consistent with the presence of drugs in the pocket. (Docket No. 1 Ex. D at 12-13.) Based on this testimony, Officer Ward was justified in removing and seizing the baggie under the "plain feel" and "plain view" doctrines. The drugs in the baggie provided the basis for the arrest of Webster and the subsequent search of the car.

At the time of most of the relevant events in the criminal proceedings (the arrest, the suppression motion and the plea) a search of the car incident to Webster's arrest would have been clearly proper. Indeed, at this time, the Supreme Court's decision in *New York v. Belton*, 453 U.S. 454 (1981) was "widely understood to allow a vehicle search incident to the arrest of a recent occupant even if there is no possibility the arrestee could gain access to the vehicle at the time of the search." *Gant*, 129 S. Ct at 1718; *United States v. Nichols*, 512 F.3d 789, 797 (6th

15

Cir. 2008). This was the law at the time of the suppression hearing, and, therefore, had that motion gone forward in December 2008, the court almost certainly would have concluded that the search of the car, incident to a lawful arrest, was proper, and the suppression motion would have been denied.

*Gant*, announced in April 2009, generally restricts a warrantless vehicle search incident to a lawful arrest to only those situations in which "the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." 129 S. Ct. at 1723. Here, the offense of arrest was cocaine possession. Given all of the circumstances of the stop, including that Webster was acting hostile and fidgety, that the car smelled of drug use, and that Webster was arrested with drugs on his person, it was reasonable, under these circumstances, to believe that additional evidence of cocaine use and possession would be found in the vehicle. Therefore, Alpert's conclusion that *Gant* would not have changed the end result in this case is correct, and the undisputed facts conclusively show that Webster was not prejudiced by the fact that there was no suppression hearing.

Finally, as noted above, Webster alleges that Alpert rushed him and "coerced" him into taking the plea deal. Again, there is little in the record to suggest deficient performance or to suggest that Webster did not make the decision to plead guilty out of his own free will. Moreover, it is clear that, even if there were evidence that Alpert acted as alleged, there is nothing to indicate that Webster was prejudiced.

Indeed, in light of the fact that a suppression motion would not have been viable,

16

Webster, by proceeding to trial, faced the considerable possibility that he would have been convicted on the charges. Once convicted, as discussed above, Webster would have faced a mandatory minimum of ten years in prison, but he also ran the risk of the Government's seeking additional charges and sentencing enhancements that could have significantly added to that time. A plea deal that eliminated Webster's exposure to these risks and only added about 2.5 years on top of the mandatory minimum can only be seen as a favorable deal for Webster in light of the circumstances. The record conclusively demonstrates that there was no prejudice.[3]

---

[3] Webster also complains that the $7,438 that was seized from him by Columbia Police was not contraband but proceeds from the recent sale of his truck, and, therefore, he is entitled to this money. (Docket No. 3 at 1; Docket No. 2 at 5-6.) Webster claims that he also asked Alpert about this money and she simply said that the money had been "forfeited" and "never said anything else about it." (Docket No. 2 at 6.) Alpert states that she did investigate the source of the money and determined that it did come from a car sale, but, beyond that, she was appointed to represent Webster in the federal criminal proceedings, not to recover money seized by state authorities, particularly because Webster had a lawyer for his state proceedings. (Docket No. 20 at 4.) Alpert is clearly correct that her representation of Webster on federal drug and gun charges cannot be properly impugned because Webster now claims that Alpert did not do enough to help him recover money that was seized for forfeiture by state authorities.

17

## CONCLUSION

As the record conclusively shows that Webster is entitled to no relief, his Section 2255 motion will be denied, and this case will be dismissed.[4]

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[4]The court concludes that no Certificate of Appealability (COA) should issue because Webster has not made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Denial of a COA from this court, of course, does not preclude the petitioner from seeking a COA from the Sixth Circuit Court of Appeals. See *Wilson v. U.S.*, 287 Fed. Appx. 490, 494 (6th Cir. 2008).